**ARTHUR J. ABRAMOWITZ (AA3724)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.**
308 Harper Drive
Suite 200
Moorestown, New Jersey 08057
(856) 662-0700

Attorneys for the Debtor

| | |
|---|---|
| In re:<br><br>HAAS ENVIRONMENTAL, INC.,<br><br>        Debtor. | :  UNITED STATES BANKRUPTCY COURT<br>    FOR THE DISTRICT OF NEW JERSEY<br>:<br>    CHAPTER 11<br>:<br>    CASE NO. 13-27297 (KCF)<br>: |

### DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125 DESCRIBING FOURTH AMENDED PLAN OF REORGANIZATION OF HAAS ENVIRONMENTAL, INC.

PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION. THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. THE DEBTOR URGES THAT THE VOTER ACCEPT THE PLAN.

Dated:  April 2, 2015

HAAS ENVIRONMENTAL, INC.

By: _____
     Eugene Haas
     President

1209945.3

## TABLE OF CONTENTS

<u>Page</u>

### I. INTRODUCTION

A.    *Purpose of This Document* ................................................................ 2

B.    *Confirmation Procedures* .................................................................. 3
    1.    Persons Potentially Eligible to Vote on the Plan ............................. 3
    2.    Time and Place of the Confirmation Hearing ................................. 4
    3.    Deadline For Voting For or Against the Plan ................................. 4
    4.    Deadline For Objecting to the Confirmation of the Plan .................. 5
    5.    Identity of Person to Contact for More Information Regarding the Plan ...... 5

C.    *Disclaimer* ...................................................................................... 5

### II. BACKGROUND

A.    *The Debtor's Business* ....................................................................... 5
    1.    Description and History ................................................................ 5
    2.    The Debtor's Prepetition Financing and Use of Cash Collateral .......... 6
    3.    Principal of the Debtor's Business .................................................. 8
    4.    Management of the Debtor Before and After the Bankruptcy ............. 8

B.    *Events Leading to the Chapter 11 Filing* .............................................. 8

C.    *Significant Legal Events* .................................................................... 9
    1.    Other Current Legal Proceedings ................................................... 9
    2.    Actual and Projected Recovery of Preferential or Fraudulent Transfers ...... 13
    3.    Procedures Implemented to Resolve Financial Problems .................... 14
    4.    Current and Historical Financial Conditions .................................. 19

### III. SUMMARY OF THE PLAN OF REORGANIZATION

A.    *What Creditors and Equity Interest Holders Will Receive Under the Proposed Plan* ..... 20

B.    *Unclassified Claims* .......................................................................... 20
    1.    Administrative Expenses and Fees ................................................. 20
    2.    Priority Tax Claims .................................................................... 23

C.    *Classified Claims and Interests* .......................................................... 26
    1.    Secured Claims ......................................................................... 26
    2.    Priority Non-Tax Claims ............................................................. 31
    3.    Unsecured Claims ...................................................................... 32
    4.    Equity Interest Holders .............................................................. 33

D.    Acceptance or Rejection of Plan.................................................................... 33

E.    Means of Effectuating the Plan.................................................................... 34
    1.    Funding for the Plan.......................................................................... 34
    2.    Post Effective Date Sources and Uses of Cash ................................ 35
    3.    Post-Confirmation Management ........................................................ 36
    4.    Disbursing Agent .............................................................................. 37

F.    Other Provisions of the Plan........................................................................ 37
    1.    Executory Contracts and Unexpired Leases ..................................... 37
    2.    Changes in Rates Subject to Regulatory Commission Approval........ 39
    3.    Retention of Jurisdiction .................................................................. 39
    4.    Procedures for Resolving Contested Claims...................................... 40
    5.    Effective Date ................................................................................... 41
    6.    Modification...................................................................................... 42

G.    Tax Consequences of Plan ........................................................................... 42

H.    Exculpation ................................................................................................. 43

I.    Releases....................................................................................................... 44

J.    Section 1146 Exemption.............................................................................. 45

K.    Retention, Enforcement and Waiver of Claims........................................... 46

L.    Risk Factors ................................................................................................ 46

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

A.    Who May Vote or Object.............................................................................. 49
    1.    Who May Object to Confirmation of the Plan ................................... 49
    2.    Who May Vote to Accept/Reject the Plan ......................................... 49
    3.    Who Is Entitled to Vote .................................................................... 50
    4.    Completing and Returning Ballots.................................................... 51
    5.    Revocation of Ballots........................................................................ 52
    6.    Who Can Vote in More Than One Class ............................................ 52
    7.    Incomplete Ballots ........................................................................... 52
    8.    Publication Notice…………………………………………………………………52
    9.    Waivers of Defects, Irregularities, Etc.………………………………......52
    10.    Votes Necessary to Confirm the Plan ............................................... 53
    11.    Votes Necessary for a Class to Accept the Plan ............................... 53
    12.    Treatment of Nonaccepting Classes.................................................. 54
    13.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).................. 54

B.    Liquidation Analysis ................................................................................... 54

C.    Feasibility ................................................................................................... 56

## V. EFFECT OF CONFIRMATION OF PLAN

A.    Discharge ................................................................................................ 57

B.    Confirmation Injunction ......................................................................... 58

C.    Revesting of Property in the Debtor ....................................................... 59

D.    Modification of Plan ............................................................................... 59

E.    Post-Confirmation Quarterly Fees ......................................................... 60

F.    Dissolution of the Committee ................................................................. 60

iii

1209945.3

# I. INTRODUCTION

Haas Environmental, Inc. (the "Debtor") commenced its Chapter 11 Case by filing a

voluntary Chapter 11 petition under the United States Bankruptcy Code 11 U.S.C. §§ 101, et seq.

(the "Bankruptcy Code"), on August 6, 2013.  Chapter 11 of the Bankruptcy Code allows a

debtor, and under some circumstances, Creditors and other parties in interest, to propose a plan

of reorganization.  A plan may provide for the debtor to reorganize by continuing to operate, to

liquidate by selling assets of the estate, or a combination of both.  The Debtor is the party

proposing the Plan.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE

STATEMENT (the "Disclosure Statement") FOR THE THIRD AMENDED PLAN WHICH IS

ATTACHED HERETO AS EXHIBIT "A" (the "Plan").[1]

Under the Plan, the Debtor seeks to reorganize and continue operations.  In other words,

the Debtor seeks to accomplish payments under the Plan by providing payments to Creditors

from cash on hand on the Effective Date, the contributions from Haas and other insiders, and

ongoing operations.  The Effective Date of the proposed Plan is the later of:  (a) fourteen days

after entry of the Final Confirmation Order; (b) the date the initial payment under the Plan

Settlement is deposited with Sherman Silverstein (which deposit shall be made within three

Business Days of:  (i) Haas receiving funds from leasing oil and gas rights to Haas's property in

Bradford, Pennsylvania; (ii) Haas receiving funds from the sale of the Freehold Property; and

(iii) Stokes receiving funds from the sale of the Stokes Property); (c) the date the Plan

Administrator executes the Plan Administrator Agreement (which date shall not be more than

fourteen days after satisfaction of (a) and (b), above); and (d) in no event shall the Effective Date

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them
in the Plan.

be later than September 1, 2015, subject to an extension by consent of the Debtor and the

Committee, or pursuant to Court order.

The Plan is proposed after significant negotiations with various Creditors regarding the

treatment of their Claims, including the Committee regarding the treatment of the Claims of

Unsecured Creditors.  Those negotiations have resulted in the various settlements discussed

herein and, with respect to Unsecured Creditors, the Plan Settlement.  The Committee, therefore,

urges that Holders of Class 8 Claims vote to accept the Plan, as set forth in the letter from the

Committee attached as Exhibit "B".

**A.     Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan, and tells you certain

information relating to the Plan and the process the Court follows in determining whether to

confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

**KNOW ABOUT:**

**(1)     WHO CAN VOTE OR OBJECT;**

**(2)     THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your Claim**

**will receive if the Plan is confirmed), AND HOW THIS TREATMENT**

**COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION;**

**(3)     THE HISTORY OF THE DEBTOR;**

**(4)     WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER**

**TO CONFIRM THE PLAN;**

**(5)     THE EFFECT OF CONFIRMATION; AND**

**(6)     THE FEASIBILITY OF THE PLAN.**

1209945.3

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is your best course of action.

Read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan's provisions will govern.

Bankruptcy Code Section 1125 requires that a disclosure statement contain "adequate information" concerning the Plan.  The term "adequate information" is defined in Section 1125(a) as "information of a kind, and in sufficient detail," about a debtor, its operations, and potential tax implications of the Plan on the debtor, any successor of the debtor and on hypothetical investors typical of Claim holders that would enable such hypothetical investor of the debtor to make an informed judgment about accepting or rejecting the Plan.  The Court has determined that this Disclosure Statement satisfies the adequate information requirement, and as further set forth below, the Court has scheduled a Confirmation Hearing to consider the Plan.  A copy of the Order approving this Disclosure Statement is attached as <u>Exhibit "C"</u>.

This Disclosure Statement is provided to each Creditor whose Claim has been scheduled by the Debtor or who has filed a proof of claim against the Debtor and to each Equity Interest Holder of record as of the date of approval of this Disclosure Statement.  Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

## B.    Confirmation Procedures

### 1.    Persons Potentially Eligible to Vote on the Plan

In determining acceptance of the Plan, votes will only be counted if submitted by a Creditor whose Claim is duly scheduled by the Debtor as undisputed, non-contingent and unliquidated or who prior to December 18, 2013, has filed with the Court a proof of claim which

3

has not been disallowed or suspended prior to computation of the votes on the Plan, or has had

its Claim temporarily allowed for voting purposes pursuant to Bankruptcy Rule 3018(a).  The

ballot form that you received does not and will not constitute a proof of claim.  If you are

uncertain whether your Claim has been correctly scheduled, you should speak with your attorney

and check the Debtor's Schedules which are on file at the Office of the Clerk of the Bankruptcy

Court located at United States Bankruptcy Court, U.S. Courthouse, 402 East State Street,

Trenton, New Jersey 08608.  The Clerk of the Court will not provide this information by

telephone.

     THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS

DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT

YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS THE

PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR, ALL CREDITORS AND

EQUITY INTEREST HOLDERS IN THE CHAPTER 11 CASE.

     **2.**     **Time and Place of the Confirmation Hearing**

     The Confirmation Hearing will take place before the Court on _____, 2015, at

2:00 p.m. at the U.S. Courthouse, 402 East State Street, Trenton, New Jersey 08608.

     **3.**     **Deadline For Voting For or Against the Plan**

     If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot

and return the ballot in the enclosed envelope to Debbie Reyes, Paralegal, Sherman, Silverstein,

Kohl, Rose & Podolsky, P.A., 308 Harper Drive, Suite 200, Moorestown, New Jersey 08057.

     Your ballot must be received by _____, 2015 (the "Voting Deadline"), or it

will not be counted.

4

1209945.3

4.      **Deadline For Objecting to the Confirmation of the Plan**

Objections to confirmation of the Plan must be filed with the Court and served upon

Arthur J. Abramowitz and Jerrold N. Poslusny, Jr., Sherman, Silverstein, Kohl, Rose &

Podolsky, P.A., 308 Harper Drive, Suite 200, Moorestown, New Jersey 08057, and Mary E.

Seymour, Lowenstein Sandler LLP, 65 Livingston Avenue, Roseland, New Jersey 07068, so as

to actually be received on or before 4:00 p.m. on _____, 2015.

5.      **Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact Arthur J.

Abramowitz or Jerrold N. Poslusny, Jr. at Sherman, Silverstein.

**C.      Disclaimer**

The financial data relied upon in formulating the Plan is based on review of the Debtor's

projections and consultation with its Professional Persons.  The Debtor represents that everything

stated in the Disclosure Statement is true to the Debtor's best knowledge as of the date of this

Disclosure Statement.

**PLEASE NOTE THAT APPROVAL OF THIS DISCLOSURE STATEMENT BY**

**THE COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY**

**OR DESIRABILITY OF THE PLAN.**

## II. BACKGROUND

**A.      The Debtor's Business**

1.      **Description and History**

The Debtor is a corporation established in 1996, and its headquarters and corporate

offices are located at 7 Red Lion Road, Vincentown, New Jersey 08088.  The Debtor performs

industrial cleaning and maintenance at steel mills, and provides support services to companies

5

involved in "fracking" operations.  The Debtor's steel mill operations are located in Trinity, Alabama; Armorel, Arkansas; and Burns Harbor, Indiana.

In 2010, the Debtor expanded into the oil and gas industry in the Marcellus Shale region. The Debtor is hired by major oil and gas companies in the region to haul fresh water for the hydraulic fracturing process.  The Debtor also hauls the used water to disposal locations, and cleans frack tanks and waste water lagoons.  The Debtor's fracking operations are located in Northern and Western Pennsylvania and West Virginia.

By 2011, over 50% of the Debtor's business was related to the oil and gas industry, totaling approximately $16 million of the Debtor's revenue.  To be able to service the demand, and expecting this business to continue to grow, the Debtor made a significant investment in new equipment and vehicles, which purchases were financed largely by the Secured Creditors.

The Debtor had approximately 150 employees, as of the Petition Date.   As of the filing of the Disclosure State, the Debtor has approximately 125 employees.

## 2.    The Debtor's Prepetition Financing and Use of Cash Collateral

Pursuant to the Peoples Loans, the Debtor granted a security interest to Peoples consisting of (as detailed in the Peoples Loans), inter alia, all rights to the Debtor's tangible and intangible personal property, all of the Debtor's cash and non-cash proceeds thereof.  The Debtor acknowledges that the Peoples Liens are legal, valid, enforceable, non-avoidable, and duly perfected security interests in and liens upon the Peoples Collateral.  Peoples' Claims shall be deemed Allowed Secured Claims for all purposes under the Plan.

Pursuant to the CCG Loans, the Debtor granted a security interest to CCG consisting of (as detailed in the CCG Loans), inter alia, all rights to the Debtor's tangible and intangible personal property, all of the Debtor's cash and non-cash proceeds thereof.  The Debtor acknowledges that the CCG Liens are legal, valid, enforceable, non-avoidable, and duly

6

perfected security interests in and liens upon the CCG Collateral.  CCG's claims shall be deemed Allowed Secured Claims for all purposes under the Plan.

Pursuant to the Santander Loans, the Debtor granted a security interest consisting of (as detailed in the Santander Loans), inter alia, all rights to the Debtor's tangible and intangible personal property, all of the Debtor's cash and non-cash proceeds thereof.  The Debtor acknowledges that the Santander Liens are legal, valid, enforceable, non-avoidable, and duly perfected security interests in and liens upon the Santander Collateral.

Pursuant to the Wells Fargo Loans, the Debtor granted a purchase money security interest to Wells Fargo (as detailed in the Wells Fargo Loans) against certain vehicles which the Dbetor purchased with the proceeds of the Wells Fargo Loans.  The Debtor acknowledges that Wells Fargo's liens are legal valid, enforceable, non-avoidable, and duly perfected security interests in and liens on those vehicles.  Wells Fargo's liens shall be deemed Allowed Secured Claims for all purposes under the Plan.

On the Petition Date, the Debtor filed a motion for the use of Peoples', CCG's, and Santander's cash collateral (the "Cash Collateral Motion").  Peoples and CCG consented to the use of cash collateral so long as all such uses were subject to a budget acceptable to the Debtor on one hand and Peoples and CCG on the other.  Santander did not appear and did not oppose the Cash Collateral Motion or the proposed form of any of the Cash Collateral Orders.  The Cash Collateral Motion was granted on an interim basis on August 12, 2013, September 20, 2013, January 24, 2014, and February 26, 2014.  Pursuant to the Cash Collateral Motion, the Committee conducted an investigation into the nature, extent, and validity of the liens and security interests asserted by Peoples, CCG and Santander and has asserted lien challenges against Peoples and Santander.

7

### 3. Principal of the Debtor's Business

Haas holds 100% of the Equity Interests of the Debtor.

### 4. Management of the Debtor Before and After the Bankruptcy

Haas has been responsible for the Debtor's operations since its formation.  Haas has
remained in control of the Debtor's operations since the Petition Date.  Haas will continue to be
responsible for the Debtor's operations after confirmation of the Plan.

## B. Events Leading to the Chapter 11 Filing

The Debtor's Chapter 11 filing was precipitated by a number of factors.

In the second half of 2012 the price of natural gas declined significantly, and the Debtor's
revenue related to the natural gas industry dropped to $12 million in 2012.  The Debtor's revenue
from oil and natural gas in 2013 was $4.6 million.

At the same time, certain unsecured creditors began to pressure the Debtor for payment
of amounts that they were owed.  Several unsecured creditors obtained judgments against the
Debtor and began efforts to collect upon those judgments.  On occasions where judgment
creditors levied the Debtor's bank accounts, Santander compelled the Debtor to use these funds
to reduce Santander's Secured Claim, instead of allowing the funds to be applied to the
applicable judgment.  As a result, the Debtor was forced to attempt to resolve the judgments on a
piecemeal basis, but found that this course was not tenable.

On or about July 31, 2013, CCG began efforts to repossess certain of the Debtor's
vehicles and equipment.  If CCG had continued with those efforts, the Debtor would have been
forced to cease operations.

All of these factors left the Debtor with no option other than seeking to reorganize
pursuant to Chapter 11.

1209945.3

**C.    Significant Legal Events**

**1.    Other Current Legal Proceedings**

**Bankruptcy Proceedings**

On the Petition Date, the Debtor filed several motions including the Cash Collateral

Motion (Dkt. No. 2), a motion to pay pre-petition wages (Dkt. No. 3), and a motion to ensure that

the Debtor's utility providers would not suspend providing services to the Debtor (Dkt. No. 4).

All of these motions were granted by the Court.

On August 23, 2013, the United States Trustee appointed the Committee.  The

Committee retained Lowenstein Sandler, LLP ("Lowenstein"), as its attorneys, as of August 23,

2013, and Amper Politziner ("Amper"), as its financial advisor, as of January 1, 2014.  Upon

retaining Lowenstein, the Committee took an active role in the Chapter 11 Case and began a

review of Debtor's financial history.

On September 6, 2013, Ford filed a motion for relief from the automatic stay seeking

authority to exercise its state law remedies against the thirty-three vehicles that the Debtor

financed through Ford.  The Debtor and Ford reached an agreement pursuant to which the Debtor

turned over approximately ten of the vehicles and agreed to resume the regular monthly payment

on account of the vehicles that the Debtor retained.

In February 2014, the Committee began an investigation of the Debtor which included,

document requests directed to, and meetings with, the Debtor.  Thereafter, in July 2014, the

Committee served formal discovery requests to Mr. Haas related to the Debtor and other insiders.

As a result of its investigation, the Committee raised certain claims that it believes could be

asserted against Haas and other insiders.

On May 19, 2014, the Debtor filed a motion for approval of the Cleveland Brothers

Equipment Company Settlement.  Pursuant to the terms of the Cleveland Settlement, the Debtor

agreed to pay Cleveland $12,500, with Debtor retaining approximately $50,000 from escrow

9

funds.   Cleveland also released one of the Debtor's excavators that Cleveland was holding in

Cleveland's possession.  The Debtor and Cleveland provided mutual releases with respect to the

Settlement.  The Court approved the Cleveland Settlement on July 7, 2014.

On May 21, 2014, the Debtor filed a motion for approval of the NLRB Settlement.

Pursuant to the terms of the NLRB Settlement, the Debtor agreed to pay approximately $400 as

an Allowed Administrative Expense and approximately $6,000 as an Allowed Priority Non-Tax

Claim to current and former employees and Longshoremen Local 2038 on account of alleged

inappropriate requirements by the Debtor and Laborers Local 81 forcing the employees to join

Laborers Local 81.  The Debtor disputed the allegations but determined that the NLRB

Settlement was cost-effective in light of the potential costs and risks of further litigating the

issues.  The Court approved the NLRB Settlement on July 7, 2014.

On October 30, 2014, Cummings filed a motion for authority to file a late proof of claim

(the "Cummings Motion").  The Debtor objected to the Cummings Motion and filed a cross-

motion for damages related to Cummings' alleged violations of the automatic stay.  Cummings

and the Debtor alleged significant claims against each other in addition to those set forth in the

Cummings Motion and the Debtor's cross-motion.  Prior to a hearing on the Cummings Motion

and the Debtor's cross-motion, Cummings and the Debtor agreed to mediate all of the issues

between the parties.  Prior to mediation, Haas and Mr. Cummings entered into settlement

discussions amongst themselves, which resulted in the Cummings Settlement.  The Cummings

Settlement provides:  (a) for the Debtor to assume the lease with Cummings which lease will be

modified as set forth in the Cummings Settlement; (b) for the Debtor to pay Cummings $180,000

as an administrative expense claim on account of all of Cummings' alleged Claims (which

Cummings' alleged to have totaled approximately $168,000 pre-petition, $192,000 post-petition,

and potential rejection damages), which will be paid at least in part by providing $6,000 from

10

each load of Inventory sold by the Debtor to a third party; (c) that the Debtor will resume regular

monthly payments to Cummings effective as of January 2015; (d) that the Debtor may terminate

the lease on seven days' notice to Cummings; and (e) that the Debtor and Cummings will

cooperate in determining any damages to the premises at the conclusion of the lease.[2]  The

Debtor intends to file a motion seeking approval of the Cummings Settlement once the

Cummings Settlement is fully documented.  The Committee has reserved all rights to object to

and/or otherwise challenge the proposed Cummings Settlement.

On December 5, 2014, the Debtor filed a motion to sell the Glen Dale Property to

Ellsworth Scherich for $99,000.  The Court entered an order approving the sale of the Glen Dale

Property on December 29, 2014.  The sale of the Glen Dale Property closed on January 13, 2015.

The net proceeds of the sale plus the realtor's commission, totaling approximately $94,000 was

placed into escrow with Sherman Silverstein.  Upon approval of the realtor's fee application of

$5,940, Sherman Silverstein will release the commission to the realtor.

The Court has approved the employment of the following professionals on Debtor's

behalf:  Cozen O'Connor ("CO"), the Debtor's initial counsel was retained from the Petition

Date through December 8, 2013; Sherman Silverstein from December 9, 2013 to the present;

Woodworth & St. John ("W&S") was retained as the Debtor's accountants as of the Petition

Date; Guida Realty was retained as the Debtor's realtor to assist with the sale of the Steubenville

Property; and Kennen & Kennen, Inc. was retained as the Debtor's realtor to assist with the sale

of the Glen Dale Property.

Other than those discussed above, no significant motions are currently pending.

---

[2] To the extent the terms of the Cummings Settlement differ from those set forth above, the
Cummings Settlement shall control.

1209945.3

**Other Legal Proceedings.**

The Debtor is aware of the following legal proceedings that were pending on the Petition

Date:

(1)      <u>Cintas Corporation  v. Haas Environmental, Inc.</u>, Docket No. GD-13-5133,

Court of Common Pleas of Allegheny County, Pennsylvania.

(2)      <u>Cummings Land and Development Company v. Haas Environmental, Inc.</u>,

Docket No. 13cv000070, Court of Common Pleas of Bradford County, Pennsylvania.

(3)      <u>International Longshoremen's Association</u>, Local Arbitration 2038 GLDC-ACD,

AFL-CIO, Case No.  25-CA-100362, National Labor Relations Board.

(4)      <u>Hydro Recovery, LP v. Haas Environmental, Inc.</u>,  Docket No. 809-cv-2012,

Court of Common Pleas of Tioga County, Pennsylvania.

(5)      <u>Lancaster Oil Company, Inc. d/b/a Environmental Recovery Corporation v. Haas</u>

<u>Environmental, Inc.</u>, Docket No. 13-1377, Court of Common Pleas of Lancaster County,

Pennsylvania.

(6)      <u>Recoil, Inc. v. Haas Environmental, Inc.</u>, Docket No. 2012-SU-002952-86, Court

of Common Pleas of York County, Pennsylvania.

(7)      <u>UniFirst Corporation, Location #227 v. Haas Environmental, Inc.</u>, No. 18 137E

0054 13, American Arbitration Association.

(8)      <u>Cleveland Brothers Equipment Co., Inc. v. Haas Environmental, Inc.</u>, Docket No.

2:12-cv-01541-AJS, United States District Court, Western District of Pennsylvania.

(9)      <u>Leslie Equipment Company v. Haas Environmental, Inc.</u>, Docket No. 13-C-18,

Circuit Court of Webster County, West Virginia.

12

(10)    <u>Susquehanna Paper & Sanitary Supply Corp. v. Haas Environmental, Inc. and
Eugene Haas</u>, Docket No. 12-01135, Court of Common Pleas of Lycoming County,
Pennsylvania.

(11)    <u>Williams Oil Company Incorporated v. Haas Environmental, Inc.</u>,  Docket No.
12cv000163, Court of Common Pleas of Bradford County, Pennsylvania,

(12)    <u>Lora Dennis v. Haas Environmental, Inc.</u>, Docket No. 13-cv-00507-WDS-PMF,
United States District Court, Southern District of Illinois,

(13)    <u>Carey McCullough v. Haas Environmental, Inc.</u>, Docket No. 13-C-14, Circuit
Court of Pleasants County West Virginia.

(14)    <u>E-Tank, Ltd. v. Haas Environmental, Inc. and Eugene Haas</u>, Docket No.
2013cv02341, Court of Common Pleas, Stark County Ohio.

(15)    <u>Mudhopper Oilfield Services, Inc. v. Haas Environmental, Inc.</u>, Docket No. 13-C-
76,  Circuit Court of Wetzel County, West Virginia.

(16)    <u>Steven R. Steele v. K. Investments WV, LLC, Haas Environmental, Inc. and John
Doe 1-3</u>, Docket No. 13-C-79, Circuit Court of Wetzel County, West Virginia.

**2.    Actual and Projected Recovery of Preferential or Fraudulent Transfers**

In addition to transfers made to Haas and other insiders discussed in Art. IV.B. of this
Disclosure Statement, the Debtor is aware of approximately $800,000 of transfers that may be
considered to be preferential payments to non-insiders.  A list of those transfers and the specific
transferee is attached to the Debtor's schedules, which are on file with the Clerk of the Court.
Pursuant to the Plan Settlement, the Debtor and the Committee have agreed to transfer potential
Avoidance Actions to the Plan Administrator for the benefit of Holders of Allowed Class 8
Claims and to confer regarding certain Avoidance Actions that the Debtor and Haas would like
the Debtor's estate to deem to waive and discharge its right to pursue.

13

### 3.      Procedures Implemented to Resolve Financial Problems

The Debtor has taken several steps in an effort to remedy the problems that led to the

bankruptcy filing.  The Debtor with the consent of the Committee, Peoples, CCG, and Wells

Fargo, retained Hunyady to conduct an auction sale of certain of its assets.  The Auction was

held on December 18, 2013, and resulted in gross sales of approximately $1.9 million.  After

accounting for Hunyady's commissions and costs, Peoples received $618,360.07 in partial

settlement of its Secured Claim; CCG received $1,037,304.69 in partial settlement of its Secured

Claim; Wells Fargo received $84,469.72 in partial settlement of its Secured Claim; and the

Debtor received $9,868.72, which Sherman Silverstein is holding in its trust account, pending

further Court order.

After the Auction, the Debtor on one hand, and Peoples and CCG on the other, entered

into the CCG and Peoples Plan Agreement, pursuant to which the Debtor, Peoples, and CCG

agreed to the treatment of Peoples and CCG under the Plan, and agreed to the timing and

amounts of payments to be made to Peoples and CCG prior to confirmation of the Plan, which

terms were included in the February 26, 2014 Cash Collateral Order.  The Committee consented

to the terms of the February 26, 2014 Cash Collateral Order, but reserved all of its rights related

to the CCG and Peoples Plan Agreement and the proposed Plan treatment of Peoples and CCG

that is set forth in the CCG and Peoples Plan Agreement.

Prior to filing the Disclosure Statement and Plan, Santander filed a suit against Haas and

other insiders in the Superior Court of New Jersey, on account of their guaranty of the Santander

Loans.  Santander obtained a judgment against Haas, Mrs. Haas, and Shale on or about January

28, 2014.  Santander raised several arguments related to its Claims, and the ability of Haas and

other insiders to make payments under the Plan in light of its judgment.  After extensive

14

negotiations between the Debtor, Haas, Shale, and Santander, the parties reached the Santander

Settlement, pursuant to which the parties agreed to Haas making an initial payment of $150,000

to Santander from the sale of certain of his personally owned vehicles (to which Santander has

asserted a judgment lien), an initial payment from Shale, the proceeds of the sale of real property

owned by K Investments, an insider and regular monthly payments from the Debtor to Santander

on account of it Class 4 Claim and Shale ($16,000 per month for twenty-five months) over time

to satisfy Santander's Claims and the judgment against Haas and other insiders.  A copy of the

Santander Settlement is attached to the Plan as Exhibit A.  As part of the Santander Settlement,

Santander consented to its Unsecured Claim to be classified separately from other Unsecured

Claims because of Santander's claims against guarantors and because of the payments Santander

will receive from guarantors.  Because of the unique nature of Santander's Unsecured Claim

compared to other Unsecured Creditors, the fact that Santander may be paid in full by non-

Debtor Persons, or as a result of a lawsuit against its former attorneys related to the Santander

Loans, the Debtor believes it is appropriate to separately classify Santander's Unsecured Claim.

The Debtor has negotiated new contracts with certain of its customers, expanding

services or increasing the Debtor's rates.  The Debtor has also been able to enter into contracts

with new customers, which will further allow the Debtor to expand its business.  For example,

the Debtor recently entered into new contracts with steel mills in Tennessee and Illinois.

The Debtor has continued efforts it began prior to the Petition Date to increase its

efficiency in billing and collecting its accounts receivable.  The Debtor has made significant

strides in this area and is presently collecting at a rate more efficient than prior to the Petition

Date.

15

### 4.      The Plan Settlement

On May 28, 2014, the Debtor filed its initial plan and disclosure statement.  After filing the

initial plan and disclosure statement, the Debtor and Haas on one hand, and the Committee on

the other, entered into negotiations in an effort to resolve the Committee's objection to the initial

plan and disclosure statement and to reach agreement related to the treatment of holders of

Allowed Unsecured Claims.  On or about September 22, 2014, the parties reached agreement in

principal on the Plan Settlement, which has subsequently been modified  as a result of other

settlements entered into by the Debtor and Haas.  The Plan Settlement is subject to satisfactory

documentation of same.  Pursuant to the Plan Settlement:

(a)      The Debtor, Haas and other Releasees (as defined in the Plan) will make

payments to the Plan Administrator for distribution to holders of Allowed Class 8 Claims equal

to 50% of the total amount of Allowed Class 8 Claims ("Plan Settlement Payment"). The Debtor

will continue its review and analysis of all scheduled and filed Claims and take all actions as

appropriate to prosecute objections to Class 8 Claims prior to or after confirmation. After the

Effective Date, the Plan Administrator shall have the right to receive notice and object to any

motion or other proceeding pursuant to which the Reorganized Debtor seeks to resolve any

Claims that would have the effect of increasing the Class 8 Claims pool.

(b)      The sources for the Plan Settlement Payment will include, but are not limited to:

(i) proceeds from Haas's leasing of mineral rights at his property located in Bradford,

Pennsylvania; (ii) sales of real estate owned by the Debtor, Haas, or other Releasees, including

but not limited to the Freehold Property, the Stokes Property and the Gun Club; (iii) liquidation

or re-financing of other of Haas's or other Releasees' assets (including vehicles); and (iv) the

Debtor's ongoing operations.

16

(c)        The Debtor will provide the Plan Administrator with mortgages against the

Steubenville Property, as well as the Debtor's properties in Blytheville, Arkansas, and

Vincentown, New Jersey.  However, if or when any of those properties are sold the funds will be

placed into the Plan Payment Fund.  The purpose of providing these mortgages is to ensure that:

(i) the Plan Settlement Amount is satisfied; (ii) the Debtor does not sell or refinance these

properties without notice to the Plan Administrator; and (iii) the net proceeds of the sale(s) be

used as part of the consummation of the Plan.

(d)        The Debtor, Haas, and other Releasees will provide the Plan Administrator with

notes, liens, mortgages and other necessary documentation to (i) secure the Plan Settlement

Payment and (ii) properly document the Plan Settlement to ensure that the Plan Administrator,

for the benefit of Allowed Class 8 Claimants, has a properly perfected lien and security interest

to secure the Plan Settlement Payment.

(e)        Payment of the Plan Settlement Payment will begin on the Effective Date, with

a minimum initial payment of $300,000.  The Debtor, Haas, and other insiders will make

installment payments on a quarterly basis thereafter until the Plan Settlement Payment is paid in

full.

(f)        All Plan Settlement Payments must be completed by the third anniversary of the

Effective Date.

(g)        In the event that the Debtor, Haas and/or other Releasees make accelerated

payments under the Plan Settlement such that not less than 95% of the Plan Settlement Payment

is paid on or prior to the second anniversary of the Effective Date, the Plan Administrator will

"forgive" the remaining 5% balance.  By way of example, if the total amount of Allowed Class 8

Claims were $3 million, the Plan Settlement Payment would be $1.5 million.  If the Debtor,

17

Haas, or other Releasees make payments totaling $1.425 million to the Plan Administrator on or prior to the second anniversary of the Effective Date, the remaining balance will be forgiven.

(h)    Upon payment of the full amount of the Plan Settlement Payment (or 95% as set forth in subparagraph (g), above), the Releasees will be released by the Debtor's estate as set forth in Art. IV.H. of the Plan.

(i)    The Plan Administrator will be responsible for making all distributions to holders of Allowed Class 8 Claims.

(j)    The Plan Administrator's and his professionals' fees and expenses will be paid from the Plan Settlement Payments.

(k)    On the Effective Date, the Debtor/Reorganized Debtor shall assign to the Plan Administrator for the benefit of general unsecured creditors with Allowed Class 8 Claims, any and all Avoidance Actions other than certain Avoidance Actions against Persons that continue to do business with the Reorganized Debtor that the Debtor, the Committee, and the Plan Administrator agree shall not be pursued, including without limitation, against Santander (the "Waived Avoidance Actions"). From and after the Effective Date, the Plan Administrator shall have the right to prosecute, settle, and compromise the Avoidance Actions except for the Waived Avoidance Actions. The Reorganized Debtor shall provide the Plan Administrator (including its representatives and agents) with reasonable access to its books, records and employees for the purpose of allowing the Plan Administrator to investigate, prosecute, and settle Avoidance Actions.

(l)    Commencing on the Effective Date, the Plan Administrator shall have the right to monitor the Reorganized Debtor's operations. The Reorganized Debtor shall provide the Plan Administrator with financial statements, monthly updates on the Reorganized Debtor's

18

operations and other information as the Plan Administrator and Reorganized Debtor shall agree upon.  The Plan Administrator's right to such information shall terminate upon receipt of the last installment of the Plan Settlement Payment.

(m)     Haas, Kim Haas and all other Releasees shall waive all claims (secured or unsecured) against the Debtor's estate and shall not share in the Plan Settlement Payment as set forth in Section II.C., supra.

(n)     Until such time as the Plan Settlement Payment is satisfied in full (or 95% as set forth in subparagraph (f), above), Haas' and other insider's yearly salary and other benefits shall be capped at $575,000 in the aggregate during that period.  The parties will discuss the possibility of distributions to Haas on account of flow through taxes.

(o)     Haas, Mrs. Haas, any Insiders and other Releasees will consent to a tolling of the statute of limitations for Avoidance Actions until the Plan Settlement Payment is paid in full (or 95% as set forth in subparagraph (g), above).

(p)     On the Effective Date, the Committee will dismiss its complaint against Santander, with prejudice.

## 5.     Current and Historical Financial Conditions

As of the Petition Date, the Debtor scheduled the value of its assets at approximately $10.1 million, consisting primarily of cash, accounts receivable, vehicles, and equipment.  The Debtor notes that the value of its assets were their book values, and did not represent their liquidation value, which because of the Debtor's business, may be substantially less.  Based upon its schedules and the claims register maintained by the Bankruptcy Clerk's office, the Debtor estimates total liabilities as of the Petition Date of approximately $11.1 million (after completing objections to Claims) consisting primarily of debt to the Secured Lenders, and Unsecured Claims of trade accounts payable.

19

## III. SUMMARY OF THE PLAN OF REORGANIZATION

**A.**     **What Creditors and Equity Interest Holders Will Receive Under the Proposed Plan**

The Plan classifies Claims and Equity Interests in various classes, states whether each

class is Impaired or unimpaired, and provides the treatment of each class.

**B.**     **Unclassified Claims**

Certain types of Claims are not placed into voting classes.  They are not considered

Impaired and are not entitled to vote on the Plan because they are entitled under the Bankruptcy

Code to specific treatment.  As such, the Debtor has <u>not</u> placed the following Claims in a class:

**1.**     **Administrative Expenses and Fees**

Under section 503(b) of the Bankruptcy Code, Administrative Expenses are Claims for

fees, costs or expenses of administering the Chapter 11 Case, including all Professional Claims

pursuant to sections 327, 330, 328, 331, 503(b) or 1103 of the Bankruptcy Code.  The

Bankruptcy Code requires that all Administrative Expenses including fees payable to the Court

and the Office of the United States Trustee that are incurred during the pendency of the Chapter

11 Case be paid on the Effective Date of the Plan, unless a particular Claimant agrees to a

different treatment.

**503(b)(9) Claims**

A 503(b)(9) Claim is a Claim for goods provided to the Debtor within twenty days before

the Petition Date.  The Debtor is not aware of any 503(b)(9) claims, however, to the extent a

Creditor believes it holds a 503(b)(9) Claim, it must file a request for payment with the Court,

and serve such request upon the Debtor's counsel and the Committee's counsel, not later than

thirty days after the Effective Date.  Not later than 60 days after the Effective Date the Debtor or

the Reorganized Debtor shall either:  (a) file an objection to any 503(b)(9) Claim for any reason;

or (b) pay the 503(b)(9) Claim.  Contested 503(b)(9) Claims will be paid (in the amount allowed

by the Court) within ten Business Days of a Final Order allowing such 503(b)(9) Claim.

20

**Professional Persons**

The following chart lists all of the Debtor's anticipated Professional Claims through the Effective Date.  All Allowed Professional Claims will be paid in full on the later of:  (i) Effective Date or (ii) within ten days upon Court approval of said fees and expenses, or (iii) as set forth below.  The U.S. Trustee's fees, by statute, must be paid on the Effective Date.

| NAME | AMOUNT ESTIMATED THROUGH THE EFFECTIVE DATE | PREVIOUSLY APPROVED PROFESSIONAL CLAIMS | ESTIMATED PROFESSIONAL CLAIM TO BE PAID |
|---|---|---|---|
| CO | $184,164.07 | $184,164.07 | $119,605.69 |
| Sherman Silverstein | $250,000.00 | $178,106.43 | $250,000.00 |
| W & S | $10,000.00 | $5,161.10 | $4,838.90 |
| Guida Realty | $16,200.00 | $0.00 | $0.00 |
| Kennen & Kennen, Inc. | $5,940.00 | $0.00 | $0.00 |
| Lowenstein Sandler | $225,000.00 | $0.00 | $225,000.00 |
| Amper | $75,000.00 | $0.00 | $75,000.000 |
| Hunyady | $197,696.80 | $197,696.80 | $0.00 |
| Office of U.S. Trustee Fees | $30,000.00 | $0.00 | $30,000.00 |
| TOTAL: | $994,000.87 | $565,128.40 | $704,444.59 |

CO received a pre-petition retainer of $67,909.00.  CO applied this retainer to the amount of its Allowed Professional Claim.  The Debtor estimates it will be responsible for payment of $704,444.59 of Allowed Professional Claims after confirmation.  Payment of Allowed Professional Claims will be made from, underline inter alia, the net proceeds of the sale of the Inventory and if those funds are insufficient, from the Plan Payment Fund, the Debtor, or the Reorganized Debtor's operations.  The Carve Out will remain in full force and effect until all Allowed Professional Claims are paid in full.

If the net proceeds from the Sale of Inventory and the Plan Payment Fund are not sufficient to satisfy Allowed Professional Claims, the Debtor shall provide an amount equal to 25% of the remaining Allowed Professional Fees within 15 days of the end of each quarter for one year, which payments will begin no later than October 15, 2015.

**Court Approval of Professional Claims Required:**

Pursuant to the Bankruptcy Code, the Court must rule on and allow all Professional

Claims whether listed in the above chart or otherwise before the fees and expenses will be owed

by the Debtor.  Professional Persons must file and serve a properly noticed fee applications for

compensation and reimbursement of expenses and the Court must rule on those applications.

Only the amount of compensation and reimbursement of expenses allowed by the Court will be

owed and required to be paid under the Plan as an Administrative Expense.

Each Professional Person who asserts a Professional Claim that accrues before the

Effective Date shall file with the Bankruptcy Court, and serve on all parties required to receive

notice, an application for compensation and reimbursement of expenses no later than thirty days

after the Effective Date.  No motion or application is required to fix the fees payable to the

Clerk's Office or Office of the United States Trustee.  Such fees are determined by statute.

**Other Administrative Expenses**

Other Administrative Expenses may include certain amounts owed to the Debtor's

employees for time worked after the Petition Date or claims of Persons that provided goods or

services to the Debtor after the Petition Date.  Because substantially all Administrative Expenses

have been and will continue to be satisfied on a current basis, the Debtor does not believe that

there will be other significant Administrative Expenses.

Pursuant to the Cummings Settlement, Cummings will be entitled to payment of a total of

$180,000 (inclusive of amounts paid prior to the Effective Date).  Among other sources,

Cummings will be paid by applying the $12,000 security deposit it is holding, and the Debtor

will pay Cummings $6,000 from each load of Inventory removed from the premises.

The Debtor's ordinary course Administrative Expenses will be paid in the ordinary

course of its business after the Effective Date.  If there is a dispute as to the amount owed to a

22

particular holder of an alleged Administrative Expense, the party claiming an entitlement to an

Administrative Expense must file a motion within thirty days of the Effective Date requesting a

determination of the amount of the Administrative Expense which motion will be determined by

the Court.

The Administrative Expense portion ($394) of the NLRB Settlement will be due and

payable to the NLRB within ten Business Days of the Effective Date.

## 2.    Priority Tax Claims

Priority Tax Claims are certain unsecured income, employment and other taxes described

by Bankruptcy Code Section 507(a)(8).  The Bankruptcy Code requires that each holder of such

a Priority Tax Claim receive the present value of such Priority Tax Claim in cash (i) of a total

value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim; (ii) over a

period ending not later than five years after the date of the order for relief under 11 U.S.C.

§§ 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority

Unsecured Claim provided for by the Plan (other than cash payments made to a class of

Creditors under 11 U.S.C. § 1122(b)).  The Debtor is aware of the following Priority Tax Claims:

| PRIORITY TAX CLAIMANT | DESCRIPTION OF ALLEGED PRIOIRTY TAX | TREATMENT |
|---|---|---|
| Indiana Dept. of Revenue - $6,199.70 | Corporate and Withholding Taxes | No later than 120 days after the Effective Date (unless such deadline is extended by the Court), the Reorganized Debtor shall file an objection to this Priority Tax Claim.  If the Reorganized Debtor does not file an objection, this Priority Tax Claim shall become an Allowed Priority Tax Claim, the Reorganized Debtor will pay such Allowed Priority Tax Claim whether determined by the Claim, as filed, or by Final Order of the Court on the tenth Business Day of the later of:  (a) payment, in full, of all Allowed Professional Claims; or (b) a Final Order of the Court determining the amount of the Priority Tax Claim. |

23

| PRIORITY TAX CLAIMANT | DESCRIPTION OF ALLEGED PRIOIRTY TAX | TREATMENT |
|---|---|---|
| Louisiana Dept. of Revenue - $1,396.53 | Corporate and Sales Taxes | No later than 120 days after the Effective Date (unless such deadline is extended by the Court), the Reorganized Debtor shall file an objection to this Priority Tax Claim.  If the Reorganized Debtor does not file an objection, this Priority Tax Claim shall become an Allowed Priority Tax Claim, the Reorganized Debtor will pay such Allowed Priority Tax Claim whether determined by the Claim, as filed, or by Final Order of the Court on the tenth Business Day of the later of:  (a) payment, in full, of all Allowed Professional Claims; or (b) a Final Order of the Court determining the amount of the Priority Tax Claim. |
| Louisiana Dept. of Revenue - $111.00 | Franchise Taxes | No later than 120 days after the Effective Date (unless such deadline is extended by the Court), the Reorganized Debtor shall file an objection to this Priority Tax Claim.  If the Reorganized Debtor does not file an objection, this Priority Tax Claim shall become an Allowed Priority Tax Claim, the Reorganized Debtor will pay such Allowed Priority Tax Claim whether determined by the Claim, as filed, or by Final Order of the Court on the tenth Business Day of the later of:  (a) payment, in full, of all Allowed Professional Claims; or (b) a Final Order of the Court determining the amount of the Priority Tax Claim. |
| Pennsylvania Dept. of Revenue - $10,701.00 | Capital Stock-Franchise Taxes | No later than 120 days after the Effective Date (unless such deadline is extended by the Court), the Reorganized Debtor shall file an objection to this Priority Tax Claim.  If the Reorganized Debtor does not file an objection, this Priority Tax Claim shall become an Allowed Priority Tax Claim, the Reorganized Debtor will pay such Allowed Priority Tax Claim whether determined by the Claim, as filed, or by Final Order of the Court on the tenth Business Day of the later of:  (a) payment, in full, of all Allowed Professional Claims; or (b) a Final Order of the Court determining the amount of the Priority Tax Claim. |

1209945.3

| PRIORITY TAX CLAIMANT | DESCRIPTION OF ALLEGED PRIOIRTY TAX | TREATMENT |
|---|---|---|
| Illinois Dept. of Revenue - $7,638.75 | Occupation and Use Taxes | No later than 120 days after the Effective Date (unless such deadline is extended by the Court), the Reorganized Debtor shall file an objection to this Priority Tax Claim.  If the Reorganized Debtor does not file an objection, this Priority Tax Claim shall become an Allowed Priority Tax Claim, the Reorganized Debtor will pay such Allowed Priority Tax Claim whether determined by the Claim, as filed, or by Final Order of the Court on the tenth Business Day of the later of:  (a) payment, in full, of all Allowed Professional Claims; or (b) a Final Order of the Court determining the amount of the Priority Tax Claim. |
| Ohio Bureau of Workers' Compensation - $4,139.34 | Priority Tax Claim | No later than 120 days after the Effective Date (unless such deadline is extended by the Court), the Reorganized Debtor shall file an objection to this Priority Tax Claim.  If the Reorganized Debtor does not file an objection, this Priority Tax Claim shall become an Allowed Priority Tax Claim, the Reorganized Debtor will pay such Allowed Priority Tax Claim whether determined by the Claim, as filed, or by Final Order of the Court on the tenth Business Day of the later of:  (a) payment, in full, of all Allowed Professional Claims; or (b) a Final Order of the Court determining the amount of the Priority Tax Claim. |
| Jefferson County Ohio Treasurer - $12,701.11 | Real Estate Taxes | In the event the Debtor disputes this Priority Tax Claim, within thirty days of the Effective Date, the Debtor or the Reorganized Debtor will file an objection to the Priority Tax Claim.  To the extent the claim of Jefferson County becomes an Allowed Priority Tax Claim, the Debtor or Reorganized Debtor will pay such Allowed Priority Tax Claim from the proceeds of the Sale of the Steubenville Property. |

25

| PRIORITY TAX CLAIMANT | DESCRIPTION OF ALLEGED PRIORITY TAX | TREATMENT |
|---|---|---|
| State of Arkansas, Dept. of Workforce Services - $522.70 | Priority Tax Claim | No later than 120 days after the Effective Date (unless such deadline is extended by the Court), the Reorganized Debtor shall file an objection to this Priority Tax Claim.  If the Reorganized Debtor does not file an objection, this Priority Tax Claim shall become an Allowed Priority Tax Claim, the Reorganized Debtor will pay such Allowed Priority Tax Claim whether determined by the Claim, as filed, or by Final Order of the Court on the tenth Business Day of the later of:  (a) payment, in full, of all Allowed Professional Claims; or (b) a Final Order of the Court determining the amount of the Priority Tax Claim. |
| State of New Jersey, Dept. of Labor - $407.89 | Priority Tax Claim | No later than 120 days after the Effective Date (unless such deadline is extended by the Court), the Reorganized Debtor shall file an objection to this Priority Tax Claim.  If the Reorganized Debtor does not file an objection, this Priority Tax Claim shall become an Allowed Priority Tax Claim, the Reorganized Debtor will pay such Allowed Priority Tax Claim whether determined by the Claim, as filed, or by Final Order of the Court on the tenth Business Day of the later of:  (a) payment, in full, of all Allowed Professional Claims; or (b) a Final Order of the Court determining the amount of the Priority Tax Claim. |

**C.    Classified Claims and Interests**

**1.    Secured Claims**

Secured Claims are Claims secured by liens on property of the estate.  The following

chart lists all classes of the holders of Secured Claims and their treatment under this Plan:

| CLASS | DESCRIPTION | INSIDER | TREATMENT |
|---|---|---|---|
| 1 | Peoples | No | The Claims of Peoples in connection with the Peoples Loans shall be Allowed in full for all purposes under the Plan.  Peoples shall retain its liens on the property of the estate and the Reorganized Debtor's property securing the |

26

| CLASS | DESCRIPTION | INSIDER | TREATMENT |
|---|---|---|---|
| | | | Peoples Loans and the terms and conditions of the loan documents that correspond to the Peoples Loans (the "Peoples Loan Documents") shall remain in full force and effect except that the same shall be modified as set forth in the CCG and Peoples Plan Agreement.  The terms of the CCG and Peoples Plan Agreement and the Peoples Loan Documents (except as expressly modified in paragraph 3 of the CCG and Peoples Plan Agreement) are incorporated into the Plan by this reference as if fully set forth herein and therein.  In the event there are any additional, conflicting or inconsistent terms set forth in the Plan as compared to the terms set forth in the CCG and Peoples Plan Agreement and/or the Peoples Loan Documents (except as modified in paragraph 3 of the CCG and Peoples Plan Agreement), the terms of the CCG and Peoples Plan Agreement and the Peoples Loan Documents (except as modified in paragraph 3 of the CCG and Peoples Plan Agreement) shall govern and control.  Peoples has not waived, released or discharged any indebtedness, liability or obligation owed to Peoples by the Debtor and any of the Releasees, nor any right or remedy available to Peoples, as set forth in the CCG and Peoples Plan Agreement, the Peoples Loan Documents (except as modified in paragraph 3) and related guaranties; all such indebtedness, liability or obligation owed to Peoples, together with all such rights and remedies available to Peoples, the Debtor and guarantors, are expressly reserved and preserved.  Peoples is impaired and, therefore, entitled to vote. |
| 2 | CCG | No | The Claims of CCG in connection with the CCG Loans shall be Allowed in full for all purposes under the Plan.  CCG shall retain its liens on the property of the estate and the Reorganized Debtor's property securing the |

27

| CLASS | DESCRIPTION | INSIDER | TREATMENT |
|---|---|---|---|
| | | | CCG Loans and the terms and conditions of the loan documents that correspond to the CCG Loans (the "CCG Loan Documents") shall remain in full force and effect except that the same shall be modified as set forth in the CCG and Peoples Plan Agreement. The terms of the CCG and Peoples Plan Agreement and the CCG Loan Documents (except as expressly modified in paragraph 4 of the CCG and Peoples Plan Agreement) are incorporated into the Plan by this reference as if fully set forth herein and therein. In the event there are any additional, conflicting or inconsistent terms set forth in the Plan as compared to the terms set forth in the CCG and Peoples Plan Agreement and/or the CCG Loan Documents (except as modified in paragraph 4 of the CCG and Peoples Plan Agreement), the terms of the CCG and Peoples Plan Agreement and the CCG Loan Documents (except as modified in paragraph 4 of the CCG and Peoples Plan Agreement) shall govern and control. CCG has not waived, released or discharged any indebtedness, liability or obligation owed to CCG by the Debtor and any of the Releasees, nor any right or remedy available to CCG, as set forth in the CCG and Peoples Plan Agreement, the CCG Loan Documents (except as modified in paragraph 4) and related guaranties; all such indebtedness, liability or obligation owed to CCG, together with all such rights and remedies available to CCG, the Debtor and guarantors, are expressly reserved and preserved. CCG is impaired and, therefore, entitled to vote. |
| 3 | Wells Fargo | No | The Claims of Wells Fargo in connection with the Wells Fargo Loans shall be Allowed as a secured claim in the amount of $736,305.08 less any adequate protection payments made to Wells Fargo after November 1, 2014, which amount represents the liquidation value of Wells Fargo's collateral. Wells Fargo shall |

| CLASS | DESCRIPTION | INSIDER | TREATMENT |
|---|---|---|---|
| | | | retain its liens on the property of the estate securing the Wells Fargo Loans.  The Debtor will repay the Class 3 Claim of Wells Fargo by making thirty-six monthly payments to Wells Fargo beginning 30 days after the Effective Date, which payments will be subject to a five-year amortization schedule at an interest rate of 4.75% per annum.  Thereafter, the remaining balance shall be amortized over forty-two months at an interest rate of 4.75%.  The Debtor or Reorganized Debtor will have the option to pre-pay any or all of the Allowed Secured Claim of Wells Fargo without a pre-payment penalty.  The terms and conditions of the Wells Fargo loan documents shall remain in full force and effect except that the same shall be modified as may be set forth in this paragraph.  Except as set forth herein or in a separate agreement between Wells Fargo and Haas, Wells Fargo has not waived, released or discharged any indebtedness, liability or obligation owed to Wells Fargo by the Debtor and any of the Releasees, nor any right or remedy available to Wells Fargo, the Wells Fargo Loan Documents (except as modified in this paragraph) and related guaranties; all such indebtedness, liability or obligation owed to Wells Fargo, together with all such rights and remedies available to Wells Fargo, the Debtor and any guarantors are expressly reserved and preserved.  Wells Fargo shall be deemed to waive any Unsecured Claim in that it may hold.  Wells Fargo's Class 3 Claim is impaired and, therefore, entitled to vote. |
| 4 | Santander | No | As set forth in the Santander Settlement which is attached to the Plan as Exhibit A,[3] the Secured Claim of Santander in connection |

---

[3] To the extent this discussion differs from the terms set forth in the Santander Settlement, the terms of the Santander Settlement shall control.

1209945.3

| CLASS | DESCRIPTION | INSIDER | TREATMENT |
|-------|------------|---------|-----------|
| | | | with the Santander Loans shall be Allowed in the amount of $125,000.  Santander shall retain its liens on the property of the estate securing the Santander Loans.  The Debtor will repay the Class 4 Claim of Santander pursuant to the Santander Settlement, which provides that the Debtor will make twenty-four monthly payments to Santander beginning 30 days after the Effective Date, which payments will be subject to an interest rate of 4.75% per annum, on a five year amortization schedule.  To the extent that the full amount owed to Santander has not been paid in full by Haas, Shale or other insiders prior to the twenty-fifth month after the Effective Date, the Debtor will make a lump sum payment to Santander equal to the lesser of (a) the remaining balance owed to Santander; or (b) the unpaid portion of Santander's Allowed Class 4 Claim.  The remainder of Santander's Claim shall be considered an Unsecured Claim in Class 8A. Santander's Class 4 Claim is impaired and, therefore, entitled to vote.  Debtor, Committee and Plan Administrator waive and relinquish any and all Avoidance Actions and Causes of Action against Santander. |
| 5 | Ford | No | The Claims of Ford in connection with the Ford Loans shall be Allowed in full for all purposes under the Plan.  Ford shall retain its liens on the vehicles securing its liens and the terms and conditions of the Ford Loans shall remain in full force and effect except that the same shall be modified such that the Ford loans shall be extended and Debtor will continue making monthly payments to Ford in the amount set forth the respective retail installment contacts until the Ford Loans are paid in full.  In the alternative, at the Debtor's election, to the extent not already paid in full prior to Confirmation, on the Effective Date, the obligations under the Ford Loans may be |

30

| CLASS | DESCRIPTION | INSIDER | TREATMENT |
|-------|-------------|---------|-----------|
|  |  |  | paid in full.  Ford is impaired and, therefore, entitled to vote. |
| 6 | Liberty Bell | No | Liberty Bell will retain its mortgage against the Debtor's property located at 7 Red Lion Road, Vincentown, New Jersey.   As of February 2015, Haas will resume making regular monthly payments to Liberty Bell (which payments will be made upon Court approval of a settlement agreement with Liberty Bell, or upon the Effective Date). Upon Court approval of a settlement agreement with Liberty Bell, or upon the Effective Date, the Debtor will make twelve monthly $1,000 payments to Liberty Bell on account of arrears owed to Liberty Bell. Beginning 60 days after all obligations to Class 8 claimants are satisfied in full, Haas or the Reorganized Debtor will make monthly payments to Liberty Bell totaling $2,500 per month.   In the thirty-ninth month after the Effective Date, Haas or the Reorganized Debtor will make a balloon payment to Liberty Bell equal to the remaining amount of arrears.   Liberty Bell is impaired and, therefore, entitled to vote. |

## 2.    Priority Non-Tax Claims

Class 7 consists of Priority Non-Tax Claims against the Debtor.

| CLASS | DESCRIPTION | IMPAIRED | TREATMENT |
|-------|-------------|----------|-----------|
| 7 | Priority Non-Tax Claims owed pursuant to the NLRB Settlement totaling $6,090. | No | Allowed Class 7 Priority Non-Tax Claims will be paid from the Debtor's cash on hand within ten Business Days of the Effective Date. |

31

3.    **Unsecured Claims**

Unsecured Claims are Claims that are not secured and are not entitled to priority under 11

U.S.C. § 507(a).  These Claims are to be treated as follows:

| CLASS | DESCRIPTION | IMPAIRED | TREATMENT |
|-------|-------------|----------|-----------|
| 8 | Unsecured Claims include trade debt and other general Unsecured Claims, excluding Unsecured Claims held by Haas and any other Insider or Releasee. Estimated Class 8 Claims = $2.75 million after objections to Claims. | Yes | Allowed Class 8 Unsecured Claims will receive one or more pro rata Distributions from the Plan Administrator in accordance with the Plan Settlement in final satisfaction, settlement, release and discharge of such Allowed Class 8 Claims.  The Debtor estimates that holders of Allowed Class 8 Claims will receive 45-50% of their Allowed Claims.  Class 8 Claims are impaired and, therefore, entitled to vote. |
| 8A | Unsecured Claim of Santander. Estimated Class 8A Claims = $670,000 (to be reduced by payments to Santander by Haas and Shale). | Yes | In accordance with the Santander Settlement, Santander's Allowed Class 8A Claim will receive one distribution from the Debtor equal to 45-50% of the remaining amount of Santander's Unsecured Claim (after taking into account all payments previously made to Santander on account of the Santander Loans from any source) 60 days after the Plan Administrator receives the final payment pursuant to the Plan Settlement.  Santander's Class 8A Claim is impaired and, therefore, entitled to vote. |

32

### 4. Equity Interest Holders

Equity Interest Holders are the parties who hold ownership interest (i.e., Equity Interest) in the Debtor.  The following chart identifies the Plan's treatment of the class of Equity Interest Holders:

| CLASS | DESCRIPTION | IMPAIRED | TREATMENT |
|---|---|---|---|
| 9 | Equity Interest Holder - Haas | Yes | Pursuant to the Plan Settlement, in exchange for the New Value Contribution, the Class 9 Equity Interests Holder will retain such Class 9 Equity Interests. |

## D. Acceptance or Rejection of Plan

Each impaired class of Creditors with Claims against the Debtor's estate shall be entitled to vote separately to accept or reject the Plan.  A class of Creditors shall have accepted the Plan if at least two-thirds in the aggregate dollar amount and more than one-half in number of holders of the allowed Claims of such class that actually voted on the Plan cast their vote in favor of confirmation.  In the event that any impaired class of Creditors or Equity Interest Holders shall fail to accept the Plan in accordance with 11 U.S.C. § 1129(a), the Debtor reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with 11 U.S.C. § 1129(b). Notwithstanding anything to the contrary in the Plan and for the avoidance of doubt, the Debtor may not seek confirmation of the Plan in accordance with 11 U.S.C. § 1129(b) based on Class 9 Equity Interest Holder voting in favor of confirmation as the consenting class.

1209945.3

**E.**     **Means of Effectuating the Plan**

**1.**     **Funding for the Plan**

Payments required under the Plan will be made from several sources.  First the Debtor or

Reorganized Debtor will utilize cash on hand to fund payments required to be made directly by

the Debtor or Reorganized Debtor.

Second, funds held in escrow by Sherman Silverstein prior to the Effective Date (which

as of filing of this Disclosure Statement is approximately $100,000), as well as the net proceeds

from the sale of the Steubenville Property will be placed into the Plan Payment Fund.  If the

Debtor or Reorganized Debtor determines to sell its real property in Blytheville, Arkansas or

Vincentown, New Jersey, the net proceeds of those sales will be placed into the Plan Payment

Fund.

Third, all of  the net proceeds from Haas's lease of mineral rights at his property in

Bradford County, Pennsylvania; Haas's sale of the Freehold Property, Stokes' sale of the Stokes

Property, and K Investment's sale of the Gun Club will be split such that 65% of the net

proceeds of each sale are provided to the Plan Administrator on account of the Plan Settlement

Amount, and the remaining 35% is placed into the Plan Payment Fund.  The Debtor believes that

the net proceeds of the sales of the above lease rights and properties will be at least $1,100,000.

Fourth, the net proceeds of the sale of the Inventory which the Debtor believes will be at

least $150,000 (if not sold prior to the Effective Date), will be used solely for the payment of

Allowed Professional Claims.

Finally, proceeds from Causes of Action (for example, the Debtor may pursue causes of

action for non-payment of accounts receivable) will be placed into the Plan Payment Fund.

1209945.3

**2.      Post Effective Date Sources and Uses of Cash**

**Payments Under the Plan**

The Debtor will fund its ongoing operations and all payments to holders of Class 1-5

Claims from funds in its possession on the Effective Date and after the Effective Date.

Payments to Class 6 will be made partially by the Debtor and otherwise by Haas from his

personal funds.

Payments on account of Allowed Professional Claims will be made from the net proceeds

of the sale of the Inventory, Plan Payment Fund, and, if necessary, from the Debtor's and

Reorganized Debtor's operations.  Payments on account of Allowed Priority Tax Claims and

Allowed Class 7 Claims will be made from the Plan Payment Fund or the Debtor's operations.

The Plan Payment Fund will be initially funded by funds held in escrow by Sherman Silverstein

on the Effective Date, including:  the Debtor's share of the net proceeds from the Auction, the

net proceeds of the sale of the Steubenville Property (if such sale occurs prior to the Effective

Date), the net proceeds of the sale of the Glen Dale Property; and proceeds from any Causes of

Action.  If the sale of the Steubenville Property occurs after the Effective Date, the net proceeds

of such sale shall be deposited into the Plan Payment Fund upon closing of such sale.  In

addition, 40% of the net proceeds Haas receives from the leasing of gas and oil rights on his

property in Bradford County, Pennsylvania, Hass's sale of the Freehold Property, Stokes' sale of

the Stokes Property, and K Investment's sale of the Gun Club, shall be placed into the Plan

Payment Fund.

Distributions from the Plan Payment Fund shall be made in the following order:

a.   Payment, in full, of all Allowed Professional Claims;

b.   Payment, in full, of all Allowed Priority Tax Claims;

c.   Payment, in full, of all Allowed Class 7 Claims; and

35

d.  Distributions to the Plan Administrator in partial payment of the Plan Settlement

Amount.

The Debtor or Reorganized Debtor may initiate payments to lower levels of priority so

long as the Debtor or Reorganized Debtor reserves sufficient funds in the Plan Payment Fund to

pay all alleged, but not yet Allowed Claims in all senior levels of priority.  By way of example, if

there are alleged Professional Claims of $300,000, the Debtor or Reorganized Debtor may

initiate payments on account of Allowed Priority Tax Claims so long as the balance in the Plan

Payment Fund equals at least $300,000 after such Distributions to holders of Allowed Priority

Tax Claims.

If the net proceeds from the Sale of Inventory and the Plan Payment Fund are not

sufficient to satisfy Allowed Professional Claims, the Debtor or Reorganized Debtor shall

provide an amount equal to 25% of the remaining Allowed Professional Fees within 15 days of

the end of each quarter for one year, which payments will begin no later than October 15, 2015.

**3.       Post-Confirmation Management**

Upon the Effective Date, Allen Wilen will be deemed appointed as the Plan

Administrator and will be responsible for making Distributions of funds received under the Plan

Settlement to Holders of Allowed Class 8 Claims pursuant to 11 U.S.C. § 1123.  Wilen is a

partner at Eisner Amper and serves as one of the Committee's financial advisors.  The Plan

Administrator will also have the authority to initiate, settle, and/or resolve any objections to

Class 8 Claims and pursue any Avoidance Actions whether or not discussed in the Disclosure

Statement or listed in the Debtor's schedules or statements of financial affairs.  The Plan

Administrator will not be required to obtain a bond.  Payment of the Plan Administrator's

expenses, including expenses of his retained professionals who shall be paid reasonable hourly

fees for services rendered and reasonable expenses incurred pursuant to the Plan shall be paid

36

pursuant to the Plan Settlement.  The Plan Administrator and his professionals will not be

required to obtain Court authority for such retention nor have to obtain Court approval for their

fees and expenses.

Management of the Debtor's operations after the Effective Date will continue to be run

by Haas as its President.

### 4.    Disbursing Agent

The Plan Administrator shall act as the Disbursing Agent for the purpose of making all

Distributions to be made to Holders of Allowed Class 8 Claims.  Any administrative costs or fees

of the Disbursing Agent shall be paid from the Plan Settlement Amount.  The Debtor will act as

Disbursing Agent for the purpose of making all other Distributions under the Plan.

### F.    Other Provisions of the Plan

### 1.    Executory Contracts and Unexpired Leases

Assumptions

Except for Executory Contracts assumed or rejected by previous Order of the Court, the

Debtor will assume the Executory Contracts listed on Exhibit "B" of the Plan as of the Effective

Date and Reorganized Debtor will pay the Cure Claim listed in that exhibit.

The Cure Claim amounts listed in Exhibit "B" of the Plan are the amounts that the Debtor

believes will be payable as of the Effective Date for each Executory Contract thereon.  Unless

otherwise ordered by the Court, if a non-Debtor party to an Executory Contract listed in Exhibit

"B" of the Plan objects to the assumption of such Executory Contract or disagrees with the Cure

Claim listed in Exhibit "B" of the Plan for its Executory Contract, such non-Debtor party must

file an objection to the assumption of such Executory Contract or to the Cure Claim with the

Court and serve the objection on the respective counsel of the Debtor, and the Committee so as

to be received by the deadline for objecting to the Plan.  Any non-Debtor party to an Executory

Contract that fails to timely file and serve an objection with the Court to the assumption of such party's Executory Contract, shall be deemed to consent to the assumption of such Executory Contract.  Any non-Debtor party to an Executory Contract listed in Exhibit "B" of the Plan that fails to timely file and serve a Cure Claim objection shall be bound by the amount listed in Exhibit "B" of the Plan and shall be forever barred, estopped and enjoined from asserting any other or additional Cure Claim and no objection to a late Claim shall be necessary.  Within thirty (30) days after the Effective Date, all undisputed Cure Claims due and owing under any assumed Executory Contracts shall be paid, and all Cure Claims that are the subject of dispute shall be paid upon further agreement of the parties or upon entry of an order of the Court allowing such Cure Claims.  No portion of any disputed Cure Claim will be paid unless and until the amount of such Cure Claim is fixed by agreement of the parties or Final Order of the Court.  The Debtor estimates that Cure Claims will total $0.00.

The Debtor shall have the right to modify the list of assumed Executory Contracts by including a modified list with the Plan Supplement.

**Rejections**

Except for those Executory Contracts assumed or rejected by prior order of the Court or listed on Exhibit "B" of the Plan, the Debtor will not assume any Executory Contracts.  On the Effective Date, all Executory Contracts not listed on Exhibit "B" of the Plan shall be deemed to be rejected.

The Confirmation Order shall constitute an order approving the assumption or rejection of all Executory Contracts as set forth herein.  A party objecting to the assumption or rejection of its Executory Contract or to the proposed Cure Claim set forth above must file and serve an objection to the Plan within the deadline established for objecting to the confirmation of the Plan.

38

**THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM**

**ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT PURSUANT**

**TO THE PLAN WILL BE THIRTY DAYS AFTER THE EFFECTIVE DATE.**

Any Claim based on the rejection of an Executory Contract will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

**2.      Changes in Rates Subject to Regulatory Commission Approval**

The Debtor is not subject to government approval of its rates.

**3.      Retention of Jurisdiction**

The Court shall retain jurisdiction over the Chapter 11 Case pursuant to Sections 105(a) and 1127 of the Bankruptcy Code for the following purposes:

a.      To determine the extent, validity and amount of any and all objections to Claims.

b.      To determine any and all applications for allowance of Professional Claims.

c.      To determine any and all pending or subsequently filed adversary proceedings, Causes of Action of the Debtor against third persons, and/or contested and litigated matters.

d.      To determine any pending applications for assumption or assignment of Executory Contracts and the allowance of any Claims resulting from the rejection of any Executory Contracts.

e.      To enforce and interpret the provisions of this Plan, to resolve any disputes arising under or in connection with the Plan, to effectuate payments under the Plan, and/or to compel performance of any Person in accordance with the provisions of the Plan.

1209945.3

f.       To resolve any cases, controversies, suits, or disputes with respect to the

provisions contained in Articles IV. G and H of the Plan and to enter orders that may be

necessary or appropriate to implement such releases and other provisions.

g.       To correct any defect, cure any omission, and reconcile any inconsistency

in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent

of the Plan.

h.       To determine such other matters and for such other purposes as may be

provided in the Confirmation Order or as may be authorized under the provisions of the

Bankruptcy Code.

i.       To enter a final decree closing the Chapter 11 Case.

### 4.       Procedures for Resolving Contested Claims

Any objections to the validity and/or amount of Claims shall be filed by the Debtor, the

Reorganized Debtor, or the Plan Administrator and served upon each holder of a Claim to which

objection is made (a "Disputed Claim") no later than 120 days after the Effective Date.  The

Debtor, on its behalf and on behalf of the Reorganized Debtor, and the Plan Administrator each

reserves the right to seek extensions of the deadline from the Court.  The failure to object to any

Claim prior to the start of the Confirmation Hearing for the purpose of voting shall not be

deemed to be a waiver of the right to object thereafter to such Claim in whole or in part for the

purpose of Distribution.  Creditors whose Claims are objected to by the Debtor, the Reorganized

Debtor, or the Plan Administrator will not receive a Distribution under the Plan until the

objection has been resolved, although the Plan Administrator will reserve necessary funds

pending a determination of the amount of the Claim as if the Claim, as filed, is Allowed.

The Bar Date was December 18, 2013.  Pursuant to Local Bankruptcy Rules 3016-2(a)

and (b), the Debtor has reviewed the scheduled Claims and the proofs of claim filed against it up

to the date of this Disclosure Statement.  The Debtor, the Reorganized Debtor, or the Plan

Administrator may object to certain of the Claims in the Chapter 11 Case.  A list of Disputed

Claims to which the Debtor, the Reorganized Debtor, or the Plan Administrator has objected or

may object is attached as Exhibit "D".  The Debtor, in cooperation with the Committee, will

attempt to resolve the Disputed Claims prior to the Effective Date.

The Debtor, the Reorganized Debtor, or the Plan Administrator may object to any Claim

listed on Exhibit "D" for any reason whether such reason is listed on Exhibit "D".  Moreover, the

Debtor, on its own behalf and on behalf of the Reorganized Debtor, and the Plan Administrator,

each reserves the right to dispute and object to any Claim scheduled or filed against the estate

whether listed on Exhibit "D".

**5.        Effective Date**

The Plan will become effective on the Effective Date which is the later of:  (a) fourteen

days after entry of the Final Confirmation Order; (b) the date the initial payment under the Plan

Settlement is deposited with Sherman Silverstein (which deposit shall be made within three

Business Days of:  (i) Haas receiving funds from leasing oil and gas rights to Haas's property in

Bradford, Pennsylvania; (ii) Haas receiving funds from the sale of the Freehold Property; and

(iii) Stokes receiving funds from the sale of the Stokes Property); (c) the date the Plan

Administrator executes the Plan Administrator Agreement (which date shall not be more than

fourteen days after satisfaction of (a) and (b), above); and (d) in no event shall the Effective Date

be later than September 1, 2015, subject to an extension by consent of the Debtor and the

Committee or by Court order.

### 6.    Modification

The Debtor may in consultation with the Committee, alter, amend or modify the Plan at any time prior to the Confirmation Hearing and thereafter as provided in section 1127(b) of the Bankruptcy Code.

### G.    Tax Consequences of Plan

CREDITORS AND EQUITY INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  THE DEBTOR IS UNAWARE OF ANY TAX ISSUES THAT THE PLAN PRESENTS TO THE DEBTOR.  The Debtor CANNOT and DOES NOT represent that the tax consequences contained herein are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

In accordance with the Plan, holders of Allowed Unsecured Claims in Class 8 shall be entitled to receive their pro rata share of Distributions from contributions from Haas and other insiders and the Debtor in full and final satisfaction of such Allowed Class 8 Claims.  Each holder of an Allowed Unsecured Claim will recognize gain or loss upon receipt of such pro rata share equal to the difference between the "amount realized" by such Creditor and such Creditor's adjusted tax basis in its Claim.  The amount realized is equal to the value of such Creditor's pro rata share of the respective contribution.  Any gain or loss realized by a Creditor should constitute ordinary income or loss to such Creditor unless such Claim is a capital asset.  If a Claim is a capital asset, and it has been held for more than one year, such Creditor will realize long term capital gain or loss.

The tax consequences to Creditors will differ and will depend on factors specific to each such Creditor, including but not limited to:  (i) whether the Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the Claim, (iii) the type of

42

consideration received by the Creditor in exchange for the Claim, (iv) whether the Creditor is a

United States person or a foreign person for tax purposes, (v) whether the Creditor reports

income on the accrual or cash basis method, and (vi) whether the Creditor has taken a bad debt

deduction or otherwise recognized a loss with respect to the Claim.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX

CONSEQUENCE TO EACH CREDITOR.  FURTHERMORE, THE TAX CONSEQUENCES

OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.  THEREFORE IT

IS IMPORTANT THAT EACH CREDITOR OBTAIN ITS OWN PROFESSIONAL TAX

ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT

OF THE PLAN.

**H.**    **Exculpation**

The Debtor, the Committee, the Plan Administrator, and their respective members,

officers, directors, employees, attorneys, accountants, financial advisors, and agents (but only in

their capacity as such) shall not have, or incur, any liability to any holder of a Claim or Equity

Interest Holder for any act or omission in connection with, related to, or arising out of, the

Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan or the

administration of the Plan or the Property of the Estate, except for willful misconduct or gross

negligence, and, in all respects, the Debtor, the Committee, the Plan Administrator, and their

respective members, officers, directors, employees, attorneys, accountants, financial advisors,

and agents shall be entitled to rely upon the advice of counsel with respect to their duties and

responsibilities under the Plan.  Notwithstanding anything to the contrary herein or in the Plan,

the exculpation provision of the Plan is not intended to and shall not be deemed to affect or

release the obligations and liability of the Debtor, the Reorganized Debtor, Haas, Insiders and/or

other Releasees under the Plan and the Plan Settlement.

43

**I.      Releases**

EFFECTIVE AS OF THE DATE THAT THE PLAN ADMINISTRATOR HAS

RECEIVED THE FULL PLAN SETTLEMENT AMOUNT (OR SUCH REDUCED AMOUNT

AS SET FORTH IN THE PLAN SETTLEMENT); AND EXCEPT AS OTHERWISE

PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, TO THE FULLEST

EXTENT PERMITTED UNDER APPLICABLE LAW, FOR GOOD AND VALUABLE

CONSIDERATION, INCLUDING, WITHOUT LIMITATION, IN CONSIDERATION FOR

THE OBLIGATIONS OF THE RELEASEES UNDER THE PLAN AND, IF APPLICABLE,

NEW VALUE CONTRIBUTION, THE DISTRIBUTIONS, CONTRACTS, RELEASES AND

OTHER AGREEMENTS OR DOCUMENTS TO BE DELIVERED IN CONNECTION WITH

THE PLAN, EACH HOLDER OF A CLAIM (OTHER THAN A RELEASEE) AND EACH

EQUITY INTEREST HOLDER THAT HAS AFFIRMATIVELY VOTED TO ACCEPT THE

PLAN SHALL BE DEEMED TO HAVE FOREVER WAIVED, RELEASED AND

DISCHARGED THE RELEASEES FROM ANY AND ALL CLAIMS, OBLIGATIONS,

SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION

AND LIABILITIES (INCLUDING ANY CLAIMS OR CAUSES OF ACTION THAT COULD

BE ASSERTED ON BEHALF OF THE DEBTOR), WHETHER FOR TORT, CONTRACT,

VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE,

WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED

OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN

EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE THAT ARE

BASED IN WHOLE OR PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR

OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE

THAT REFER, RELATE OR PERTAIN TO (A) THE DEBTOR; (B) THE CHAPTER 11

44

CASE; (C) THE NEGOTIATION, FORMULATION AND PREPARATION OF THE PLAN,

OR ANY AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENT RELATED TO THE

PLAN; OR (D) THE PLAN OR ANY AGREEMENTS, INSTRUMENTS OR OTHER

DOCUMENT RELATED TO THE PLAN; PROVIDED, HOWEVER, THAT THESE

RELEASES WILL HAVE NO EFFECT ON THE LIABILITY OF ANY RELEASEE ARISING

FROM ANY ACT, OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER

OCCURRENCE CONSTITUTING WILLFUL MISCONDUCT, GROSS NEGLIGENCE,

FRAUD OR CRIMINAL CONDUCT; PROVIDED FURTHER, HOWEVER, THAT THE

FOREGOING SHALL NOT CONSTITUTE A WAIVER OR RELEASE OF ANY RIGHT OF

THE HOLDER OF AN ALLOWED CLAIM TO PAYMENT UNDER THIS PLAN ON

ACCOUNT OF SUCH ALLOWED CLAIM AND PROVIDED FURTHER, THAT THE

FOREGOING SHALL NOT CONSTITUTE A RELEASE OR WAIVER OF ANY AND ALL

OBLIGATIONS, LIABILITIES, AND DUTIES OF THE RELEASEES AND EQUITY

INTEREST HOLDER UNDER THE PLAN, INCLUDING WITHOUT LIMITATION, THE

LIABILITY OF ANY RELEASEE THAT WOULD OTHERWISE RESULT FROM THE

FAILURE TO PERFORM OR PAY ANY OBLIGATION OR LIABILITY UNDER THE

PLAN OR ANY CONTRACT, INSTRUMENT, AGREEMENT OR OTHER DOCUMENT TO

BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THE PLAN.  THE ABOVE

RELEASES DO NOT APPLY TO THE SANTANDER SETTLEMENT.

**J.**      **Section 1146 Exemption**

Pursuant to Bankruptcy Code section 1146(a):  (a) the issuance, transfer, or exchange of

notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien,

pledge, or other security interest; (c) the making or assignment of any contract, lease or sublease;

45

or (d) the making or delivery of any deed or other instrument of transfer under, in the furtherance

of, or in connection with, the Plan, including, without limitation, the transfers to be made under

Article III of the Plan, any merger agreements, agreements of consolidation, restructuring,

disposition, liquidation, or dissolution, stock purchase agreements, stockholders agreements or

stockholders rights agreements; deeds, bills of sale, or transfers of tangible property will not be

subject to any stamp tax, or other similar tax or any tax held, to be a stamp tax or other similar

tax by applicable law.  For avoidance of doubt, this exemption shall apply to the sale of:  (a) the

Inventory; (b) the Steubenville Property; and (c) any other real or personal property, in

furtherance of the Plan.

**K.      Retention, Enforcement and Waiver of Claims**

Except as provided otherwise in the Plan, the Debtor and its estate shall retain, and the

Plan Administrator pursuant to 11 U.S.C. § 1123 on behalf of the Debtor and its estate shall

enforce, any and all claims of the Debtor and/or the debtor-in-possession.  Upon notice and

consent or entry of a Final Order, the Plan Administrator shall direct the prosecution, settlement

or other compromise of any proceeding commenced in the exercise of his authority under the

Plan.  Upon Notice and Consent or Entry of a Final Order, the proceeds of any recovery shall be

deposited into the Plan Payment Fund or held by the Plan Administrator, as applicable, and

distributed according to the terms of the Plan.

**L.      Risk Factors**

The following discussion is intended to be a non-exclusive summary of certain risks

attendant upon the consummation of the Plan.  You are encouraged to supplement this summary

with your own analysis and evaluation of the Plan and Disclosure Statement, in their entirety,

and in consultation with your own advisors.  Based on the analysis of the risks summarized

below, the Debtor believes that the Plan is viable and will meet all requirements of confirmation.

1209945.3

Because of the funds that the Debtor anticipates will be available at the time of confirmation or the Effective Date and the minimal amount of anticipated Administrative Expenses and Priority Claims, the Debtor does not foresee any risk in insufficient funds being available on the Effective Date.

There are several other risks the parties in interest should consider, including that: (a) the Debtor is not able to pay the Allowed Secured Claims of the Secured Creditors; (b) the Debtor's revenues are not as high as anticipated; and (c) the Plan Settlement Payment is not provided.

The Debtor submits that each of these risks is minimal. First, the Debtor has reached an agreement with Peoples, CCG, Wells Fargo, Santander, and Ford to provide for payment of their Secured Claims over time. Finally, pursuant to the Plan Settlement, the Debtor and the Committee have reached an agreement on the timing and amounts of payments to be made to the Plan Administrator, which the Debtor believes is within the Debtor's ability to pay based upon the Debtor's projections.

As discussed above, the Debtor made internal changes, to its operations to reduce costs and increase profit margins. The Debtor has also reached new agreements with its customers to increase the rates that the Debtor is paid and believes that it will obtain new work prior to confirmation of the Plan. Therefore, the Debtor is confident that it will be able to continue operations going forward.

The Debtor does not believe that there will be an issue related to receiving Plan Settlement Payments from Haas and the other insiders because of Haas's historic involvement with the Debtor and his commitment to the Debtor's continued operations. The Plan Settlement Amount will be funded, inter alia, by Haas leasing oil and gas rights associated with his real property located in Bradford, Pennsylvania, to a third party, Haas selling the Freehold Property,

47

Stokes selling the Stokes Property, and K Investments selling the Gun Club, and potential other

sales of assets owned by Haas or other Insiders.

With regard to the lease of oil and gas rights, Haas has owned the Bradford County

property since 2009, and previously leased the oil and gas rights to Williams Oil and Gas.  That

lease expired on October 10, 2014.  Haas has discussed a lease of the mineral rights to at least

eight other parties seeking to enter into a new formal lease agreement.  Based on Haas's

discussions with those parties, Haas believes that he will receive a net of at least $500,000 for

leasing the oil and gas rights.  Haas intends to consult with a broker to assist with the marketing

and sale of the mineral rights.  Haas further believes that he will be able to enter into an

agreement prior to the Effective Date, and that (as is the norm in the industry) the lease payment

will be made "up front" such that the funds will be transferred to the Debtor's estate prior to the

Effective Date; Haas will contribute the full amount to the Debtor in order to fund payments

required under the Plan.

Finally, the Debtor believes that its projections, attached as <u>Exhibit "E"</u>, although

conservative, show that the Debtor will have sufficient funds on and after the Effective Date to

fund operations after the Effective Date and to fund amounts necessary under the Plan.  These

projections include:  (a) payment of Allowed Professional Claims; (b) payment to Secured

Creditors as required under the Plan; (c) payment of Allowed Priority Tax Claims; (d)

availability of funds to maintain ongoing operations; and (d) availability to contribute funds

pursuant to the Plan Settlement.

## IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN

SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following

1209945.3

discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan.  Some of the requirements include that the Plan must be proposed in good faith, that Creditors or Equity Interest Holders have accepted the Plan, that the Plan pays Creditors at least as much as they would receive in a Chapter 7 liquidation, and that the Plan is feasible.  These requirements are not the only requirements for confirmation.

**A.      Who May Vote or Object**

**1.      Who May Object to Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**2.      Who May Vote to Accept/Reject the Plan**

A Creditor or Equity Interest Holder has a right to vote for or against the Plan if that Creditor or Equity Interest Holder has a Claim that is both (a) allowed or allowed for voting purposes and (b) classified in an Impaired class.

**What Is an Allowed Claim/Interest**

As noted above, a Creditor or Equity Interest Holder must first have an Allowed Claim or Allowed Equity Interest to have the right to vote.  Generally, any proof of claim or Equity Interest will be Allowed, unless a party in interest brings a motion objecting to the Claim or Equity Interest.  When an objection to a Claim or Equity Interest is filed, the Creditor or Equity Interest Holder cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the Claim or Equity Interest for voting purposes.

49

1209945.3

**What Is an Impaired Claim/Interest**

An Allowed Claim or Allowed Equity Interest only has the right to vote if it is in a class

that is Impaired under the Plan.  A class is Impaired if the Plan alters the legal, equitable, or

contractual rights of the members of that class.  For example, a class comprised of general

Unsecured Claims is Impaired if the Plan fails to pay the members of that class 100% of their

Claim, plus interest.

The Debtor believes that Classes 1-5, 7, 8 and 8A are Impaired and holders of Claims or

Equity Interests in these classes are therefore entitled to vote to accept or reject the Plan.  The

Debtor believes that Class 6 is unimpaired and that holders of Claims in that class, therefore, do

not have the right to vote to accept or reject the Plan.  Parties who dispute the Debtor's

characterization of their Claim or Equity Interest as being Impaired or unimpaired may file an

objection to the Plan contending that the Debtor has incorrectly characterized that class.

### 3.    Who Is Entitled to Vote

The following four types of Claims are <u>not</u> entitled to vote under the Plan:  (a) Claims in

unimpaired classes; (b) Claims entitled to priority pursuant to the Bankruptcy Code, and (c)

Claims in classes that do not receive or retain any value under the Plan.  Claims in unimpaired

classes are not entitled to vote because such classes are deemed to have accepted the Plan.

Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(1), (2), and (7) are not

entitled to vote because such Claims are not placed in classes and they are required to receive

certain treatment specified by the Bankruptcy Code.  EVEN IF YOUR CLAIM IS OF THE

TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE

CONFIRMATION OF THE PLAN.

1209945.3

**4.    Completing and Returning Ballots**

Holders of Claims or Equity Interests entitled to vote on the Plan received a ballot with

the Disclosure Statement.  All votes to accept or reject the Plan must be cast by using the ballot

enclosed with the Disclosure Statement (or manually executed copies thereof).  No other votes

will be counted.

Please fill out the ballot and return it to:

> Sherman, Silverstein, Kohl Rose & Podolsky, P.A.
> 308 Harper Drive
> Suite 200
> Moorestown, NJ 08057
> Attn: Debbie Reyes

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND <u>ACTUALLY</u>

<u>RECEIVED</u> BY THE DEBTOR AT THE ABOVE ADDRESS on or before the Voting

Deadline, which is 4:00 p.m. (Eastern Time) on _____, 2015 which deadline may be

extended only by the Debtor or the Court.  If delivery is by mail, enough time should be allowed

to ensure timely delivery.  Ballots received after the Voting Deadline will not be counted in the

voting unless the Debtor extends the Voting Deadline, or the Court so orders.  If you have any

questions about procedures for voting, or if you did not receive a ballot, received a damaged

ballot or have lost your ballot, or have any questions about the Plan or Disclosure Statement

please call Ms. Reyes at (856) 662-0700.

The form of ballot attached to this Disclosure Statement as <u>Exhibit "F"</u> has been

approved for distribution to Class 8 Creditors to solicit their acceptance of the Plan.

Unless the ballot being furnished with this Disclosure Statement is timely submitted on or

prior to the Voting Deadline, the Debtor may reject such ballot as invalid and, therefore, decline

to utilize it in connection with seeking confirmation of the Plan by the Court.

51

5.      **Voting by Creditors Whose Claims are Subject to an Objection or Who Filed a Proof of Claim in an Unliquidated or Contingent Amount.**

Pursuant to Bankruptcy Rule 3018(a), a Creditor whose Claim is subject to an Objection or who timely filed a proof of claim in an unliquidated or contingent amount may seek consent from the Debtor to file a ballot, or may file a motion for temporary allowance of its Claim in an amount which the Court deems proper for the purpose of casting a ballot, which motion shall be filed so as to be heard prior to the Voting Deadline.

6.      **Revocation of Ballots**

Notwithstanding Bankruptcy Rule 3018(a), a Claimant that has previously cast a ballot may change or re-cast its ballot prior to the above deadline.  However, only the last timely filed ballot received from a Claimant will be considered.  Thereafter, ballots may only be changed or revoked by order of the Court.

7.      **Who Can Vote in More Than One Class**

A Creditor whose Claim is allowed partially in one class and partially in another class is entitled to accept or reject a Plan in both capacities by casting one ballot for each class it holds a Claim.

8.      **Incomplete Ballots**

Any ballot received that does not indicate either an acceptance or rejection of the Plan will be deemed as an acceptance of the Plan.

9.      **Publication Notice**

The Debtor will publish notice of the approval of the Disclosure Statement and applicable deadlines one time in the national edition of the New York Times, Wall Street Journal, or other paper of national distribution, which notice shall be substantially in the form set forth in <u>Exhibit "G"</u>.  Such publication notice shall be sufficient for all purposes under Fed. R. Bankr. P. 2002(1).

10.    **Waivers of Defects, Irregularities, Etc.**

Unless otherwise ordered by the Court, all questions as to the validity, form, eligibility

(including time of receipt), acceptance, and revocation or withdrawal of ballots will be

determined by the Debtor in its sole discretion.  The Debtor reserves the right to contest the

validity of any revocation or withdrawal.  The Debtor also reserves the right to reject any and all

ballots not in proper form, the acceptance of which would, in the Debtor's opinion, be unlawful

or prejudicial.  The Debtor further reserves the right to waive any defects or irregularities or

conditions of delivery as to any particular ballot.  The Debtor's interpretation, unless otherwise

ordered by the Court, will be final and binding on all parties.  Unless waived, any defects or

irregularities in connection with deliveries of ballots must be cured within such time as the

Debtor (or the Court) determines.  Neither the Debtor nor any other Person will be under any

duty to provide notification of defects or irregularities with respect to deliveries of ballots nor

will any of them incur any liabilities for failure to provide such notification.  Unless otherwise

directed by the Court, delivery of such ballots will be deemed not to have been made until such

irregularities have been cured or waived.

11.    **Votes Necessary to Confirm the Plan**

The Court cannot confirm the Plan unless (a) all Impaired classes have voted to accept

the Plan or (b) if at least one Impaired class has accepted the Plan without counting the votes of

any insiders within that class, the Plan is eligible to be confirmed by "cramdown" on non-

accepting classes, as discussed below.

12.    **Votes Necessary for a Class to Accept the Plan**

A class is considered to have accepted the Plan when more than half in number and at

least two-thirds in dollar amount of the Allowed Claims that actually voted, voted in favor of the

Plan.  A class of Equity Interests is considered to have accepted the Plan when at least two-thirds

53

in amount of the allowed interest-holders of such class which actually voted, voted to accept the Plan.

### 13.    Treatment of Nonaccepting Classes

As noted above, even if <u>all</u> Impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Bankruptcy Code.  The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting classes if it meets all consensual requirements except the voting requirements of Section 1129(a)(8) if one non-insider Impaired class accepts the Plan, if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each Impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### 14.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)

The Debtor will request that the Court confirm this Plan by cramdown on Impaired classes if any Impaired class(es) do not vote to accept the Plan.

## B.    Liquidation Analysis

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis.  Under the best interest test, a Claimant or Equity Interest Holder in an Impaired class that does not vote to accept the Plan, must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the debtor's assets are usually sold by a Chapter 7 trustee.  Secured Claims are paid first from the sales proceeds of properties on which the Secured Creditor has a lien.  Administrative Expenses are paid next.  Next, unsecured Creditors are paid from any

54

remaining sales proceeds, according to their rights to priority.  Unsecured Creditors with the

same priority share in proportion to the amount of their allowed Claims.  Finally, Equity Interest

Holders receive the balance that remains after all Creditors are paid in full, plus interest.

In order for the Court to be able to confirm this Plan by cram-down, the Court must find

that all Creditors and Equity Interest Holders in classes that do not accept the Plan will receive at

least as much under the Plan as such they would receive under a Chapter 7 liquidation.  The

Debtor submits that this requirement is met because a conversion to Chapter 7 would also add a

layer of Professional Claims to this case for the trustee's attorneys as well as the trustee's

commission which would likely result in significantly less funds being available for distribution

to Unsecured Creditors in Chapter 7.  The Plan estimates Unsecured Creditors will receive

45-50% on account of their Allowed Claims, which amount is greater than the 0% that

Unsecured Creditors would expect under a Chapter 7 liquidation.  Attached as Exhibit "G" is a

liquidation analysis that shows that in a Chapter 7 liquidation, Creditors would receive less in a

Chapter 7 case than they would under a Chapter 7 liquidation.

The Committee has alleged that the Debtor's estate may have claims against Haas and

other of the Releasees to recover funds that they received (directly or indirectly) from the Debtor.

In the four-year period prior to the Petition Date, Haas and other Releasees received

approximately $10.6 million from the Debtor.  Haas has alleged that a significant portion of this

amount was transferred to Haas on account of tax liability for which he was responsible on

account of the Debtor being an S corporation.  Haas further has asserted that he received all of

the funds while the Debtor was solvent, which may constitute a complete defense to any alleged

Causes of Action alleging a fraudulent transfer.  The Committee disputes these assertions and

believes that substantially all of the funds transferred to Haas and other insiders may be

avoidable and recoverable as fraudulent transfers or preferences.  Based upon the above, the

Debtor believes that any litigation brought by the Debtor's estate to recover funds from Haas or other Releasees would be very expensive and time consuming without a corresponding likelihood of a material benefit to Creditors.

The Debtor further believes that if the Debtor's estate or Creditors were to obtain a significant judgment against him or any of the Releasees, Haas and/or those Releasees would not likely have sufficient funds to satisfy any such judgment, and would contemplate filing their own bankruptcy cases.  Based upon information Haas provided, the Debtor believes that if Haas were to file his own bankruptcy petition, the Debtor's estate would receive far less than the amount of the contributions to be made by Haas and other insiders from such bankruptcy proceedings. Moreover, the estate will have incurred significant costs in pursuing any judgment against Haas. Therefore, the estate's net recovery would be well below the contributions Haas and insiders will make under the Plan Settlement.

The Debtor, the Committee, and Haas considered all of these factors entering into the Plan Settlement and agreeing to the Plan Settlement Amount, especially in light of the fact that the Plan Settlement Amount will be contributed without the Debtor's estate having to face any risk of success or collection, and will avoid the costs of litigation.

## C.    Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless such liquidation or reorganization is proposed in the Plan.  As discussed, the Debtor has taken steps to reduce costs and has implemented numerous procedures to improve revenue.  These changes will enable the Debtor to operate profitably going forward.

1209945.3

There are at least two other important aspects of a feasibility analysis. The first considers whether the Debtor will have enough cash on hand on the Effective Date to pay all the Claims and Administrative Expenses that are entitled to payment at that time. The Debtor maintains that this aspect has been satisfied because the Debtor is substantially current with all operating expenses since the Petition Date. This coupled with funds that are or will be on hand on the Effective Date ensures sufficient funds to pay all Administrative Expenses and to make all Distributions required on the Effective Date.

The second aspect considers whether the Debtor will have enough cash over the life of the Plan to make the required Plan payments. Attached as <u>Exhibit "E"</u> is the Debtor's financial forecast showing projections for operations for three years after the anticipated Effective Date. The forecast shows that the Debtor's continued operations are likely and that it should have sufficient funds to make all payments required under the Plan.

The Debtor contends that the financial projections for continued operations are feasible because they are based on the Debtor's historical income which is adjusted to reflect cost saving measures and changes in the Debtor's business model. The forecast also includes adjustments (for income and costs) related to the Debtor's new contracts and new pricing agreements with current customers.

## V. EFFECT OF CONFIRMATION OF PLAN

### A. Discharge

Except as otherwise provided for in this Plan, the Confirmation Order, or any other order of the Bankruptcy Court in accordance with section 1141(c) and (d) of the Bankruptcy Code, entry of the Confirmation Order acts as a discharge effective as of the Effective Date of all debts, Claims against, and liens on the Debtor, its assets and property, which debts, Claims, and liens arose at any time before the entry of the Confirmation Order. The discharge of the Debtor shall

57

be effective as to each Claim, regardless of whether a proof of claim was filed or whether the

Claim is Allowed or whether the holder of the Claim votes to accept the Plan.  On the Effective

Date, as to each and every discharged Claim, any holder of such Claim shall be precluded from

asserting such Claim against the Debtor or the Reorganized Debtor or its assets or properties.

**B.**     **Confirmation Injunction**

On and after the Effective Date, except to enforce the terms and conditions of the Plan

before the Court, or as permitted under an order of the Court, all Persons or entities who have

held, hold or may hold any Claim against the Debtor are, with respect to any such Claim,

permanently enjoined from and after the Effective Date from:  (a) commencing, conducting or

continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind

(including, without limitation, any proceeding in a judicial, arbitral, administrative or other

forum) against the Reorganized Debtor or any of its properties, or any direct or indirect

transferee of any property of, or direct or indirect successor in interest to, any of the foregoing

Persons or entities and all of their respective direct and indirect parents, subsidiaries and

affiliates, together with each of their respective shareholders, members, managers, general

partners, limited partners officers, directors, employees, agents, representatives, attorneys and

advisors or consultants or any property of any of the foregoing (collectively, the "Protected

Parties"); (b) enforcing, levying, attaching (including, without limitation, any pre-judgment

attachment), collecting or otherwise recovering by any manner or means whether directly or

indirectly, against any of the Protected Parties of any judgment, award, decree or order;

(c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any

encumbrance of any kind against any of the Protected Parties; (d) asserting any right of setoff,

subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to any

of the Protected Parties; and (e) taking any actions in any place and in any manner whatsoever

1209945.3

that do not conform to or comply with the provisions of the Plan. Notwithstanding the

foregoing, the Confirmation Injunction does not and shall not enjoin the Plan Administrator or

any holder of an Allowed Administrative Expense from enforcing the obligations and terms of

the Plan Settlement and the Plan. Notwithstanding anything contained herein or elsewhere in the

Plan, the Confirmation Injunction shall not release, waive or otherwise affect the obligations and

liabilities of the Debtor, the Reorganized Debtor, Haas, other Insiders or any Releasee or

Protected Party under the Plan and the Plan Settlement. The above confirmation injunction does

not apply to the Santander Settlement.

## C.      Revesting of Property in the Debtor

Upon entry of the Confirmation Order, the property of the estate shall vest in the

Reorganized Debtor pursuant to 11 U.S.C. § 1141(b). Except as otherwise provided in the Plan,

the property dealt with by this Plan will be free and clear of all Claims and interests of Creditors

of the Debtor, as set forth in 11 U.S.C. § 1141(c).

## D.      Modification of Plan

The Debtor may modify the Plan at any time before confirmation. However, the Court

may require a new disclosure statement and/or revoting on the Plan if the Debtor modifies the

Plan in a significant or material manner before confirmation.

The Debtor may also seek to modify the Plan at any time after confirmation so long as (1)

the Plan has not been substantially consummated, and (2) the Court authorizes the proposed

modification after notice and a hearing, which notice shall be provided to the Plan Administrator

and his counsel, among others. The Debtor further reserves the right to modify the treatment of

any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the

Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are

materially adversely affected, and only after notice to the Plan Administrator and his counsel.

59

E.      **Post-Confirmation Quarterly Fees**

Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) will continue to be payable by the

Debtor or Reorganized Debtor to the Office of the United States Trustee post-confirmation.  The

Reorganized Debtor shall provide thirty days prior written notice to the Plan Administrator that

the Reorganized Debtor has performed all of its duties necessary to substantially consummate the

Plan (the "Case Closing Notice Period").  If the Plan Administrator does not require the Chapter

11 Case to remain open beyond such thirty-day notice period, the Reorganized Debtor shall (at

its expense) seek a Court order closing the Chapter 11 Case.  If the Plan Administrator requires

the Chapter 11 Case to remain open after expiration of the Case Closing Notice Period, Quarterly

Fees incurred after the expiration of the Case Closing Notice Period shall be paid solely by the

Plan Administrator from funds the Plan Administrator holds pursuant to the Plan Settlement or as

proceeds of Avoidance Actions, until such time as the Chapter 11 Case is converted, dismissed,

or closed pursuant to a final decree, and the Plan Administrator shall be responsible for the costs

of closing the Chapter 11 Case.

F.      **Dissolution of the Committee**

As of the Effective Date, the Committee shall be dissolved except to the extent that the

Debtor seeks to modify the Plan after the Effective Date, and shall have no further rights or

obligations in the Chapter 11 Case, except that thereafter members of the Committee and the

Committee's professionals may seek allowance of Professional Claims for compensation and

reimbursement of expenses.

1209945.3